IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JEAN A. QUICK | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| ALBERT EINSTEIN HEALTHCARE, et al. | : | NO. 05-4940 |

O'NEILL, J.                                          OCTOBER 23, 2007

## MEMORANDUM

On September 15, 2005, plaintiff filed a complaint against defendants pursuant to the American with Disabilities Act, 42 U.S.C. §§ 1201 et seq., the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621 et seq., and the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. Ann. §§ 955 et seq., seeking damages for wrongful termination, failure to accommodate and failure to engage in the interactive process.  Before me now are the parties' cross-motions for summary judgment, responses and replies.

## BACKGROUND

Defendant Albert Einstein Medical Center ("AMEC") and the additional named defendants, entities that own, operate, control, set and direct policy for AMEC, employed plaintiff Jean A. Quick from June 12, 1975 to January 10, 2003.  On March 3, 2002, while working as patient tray services supervisor in the food and nutrition department of AMEC, plaintiff fell on a wet floor and injured her left knee.  Plaintiff was treated immediately in AMEC's emergency room.  Two days later, on March 5, 2002, plaintiff was treated at Concentra, defendants' occupational health facility.  The treating physician and Concentra diagnosed plaintiff with a left knee contusion and reported that plaintiff could return to work on March 5, albeit on a restricted basis.  Pursuant to the restrictions, plaintiff was to sit or use crutches 100

1

percent of the time and was not to squat or kneel.

Plaintiff returned to Concentra a week later, on March 12, 2002, for a follow-up appointment with another physician.  The treating physician on March 12 reported that plaintiff should be restricted from working completely.  Plaintiff visited Concentra several times over the following months, and reports from those visits indicate that plaintiff's ability to work remained restricted until June 25, 2002, when she was released to return to regular duty without restriction. Despite this, plaintiff contends that she was not fully recovered as of June 25 and continued to have problems with her left knee and her lower back.

Under defendants' work-related injury program, an employee injured in the course of employment is entitled to a ninety-day medical leave of absence and may return to her prior position any time within ninety days of her injury.  At her deposition, plaintiff testified to her awareness of this policy and her knowledge that her ninety-day leave of absence expired on June 2, 2002.[1]  On or about June 4, 2002, defendants created an internal posting for plaintiff's former patient tray services supervisor position within the food and nutrition department.  The report from plaintiff's visit to Concentra on June 7, 2002 indicated that plaintiff could not squat or kneel and should be sitting fifty percent of the time, i.e., plaintiff was still subject to restricted activity and could not return to her prior, full-duty position.

Pursuant to their standard policy and practice, defendants place any and all employees injured in the course of employment into light duty positions should they be unable to return to their regular positions.  On June 12, 2002, plaintiff returned to work as a greeter – a modified duty position – at the Germantown Medical Arts Building.  She signed a form explaining that

[1]Lori Shore, network director of defendants' food and nutrition department, testified that the leave of absence expired on June 3, 2002.

2

this modified duty position was to be "temporary, not to exceed 6 months." As stated above, defendants released plaintiff to return to regular duty without restrictions on June 25, 2002, while she was working as a greeter. On that same day, plaintiff learned that her prior position had been filled by Deborah Davis, a previously-fired employee of defendants who is seventeen years younger than plaintiff.

Plaintiff remained at her modified duty position for approximately the next six months. On July 17, 2002, a human resources specialist named Margo Vance was informed by email that plaintiff had been released to return to full duty. On October 21, 2002, plaintiff's file was given to Frank Wimmersberger, another human resources specialist employed by defendants. Though the record indicates that plaintiff and Wimmersberger met in person only twice before plaintiff was terminated, plaintiff testified at her deposition that they had several conversations in person and over the telephone to identify potential new employment positions. Plaintiff stated that she and Wimmersberger reviewed papers listing different open positions and circled a few for Wimmersberger to investigate. Plaintiff noted that "we had circled [potential positions] and he looked into them and he said they are dealing with medical terminology and I didn't have that." When asked, "Were there any jobs that you were able to identify that you were qualified for?" plaintiff responded, "Most of them I seen was physician jobs and all that kind of stuff. Respiratory and all of that, do you know what I mean? And I couldn't do none of those things." For example, plaintiff expressed interest in a receptionist position at the surgery center for liver disease, but she does not have knowledge of medical terminology or possess the requisite computer skills. Defendants contend that plaintiff did not have the requisite skills or qualifications for any position she identified.

No official paperwork documents Wimmersberger's efforts to find plaintiff a full duty position.  In a November 20, 2002 email to Stacy Cherwony of the occupational health department, Wimmersberger wrote:

> I am still trying to place Jean Quick.  She has been cleared for regular duty, but does not have a budgeted job to return to and her present position will be eliminated shortly.  There are a few jobs listed on open req report that look like they may be something Jean could do, but the grade and salary will almost absurdly be below hers.  Is this situation the same as a normal worker's comp (where they have not been released for regular duty) where the comp carrier will make up the difference in pay?

In a subsequent email on this topic, Wimmersberger wrote: "I am meeting with Jean this afternoon at 3:30 and I would like to let her know if those receptionist openings are something we can consider for her.  She will not be able to absorb the pay cut though."  In an email dated January 6, 2003, Wimmersberger, in response to the question "Anything going on?" wrote: "Looks like we have nothing.  I have asked Patrice to put together a severance package for Jean and we will not appose [sic] unemployment for her."

Plaintiff alleges that Wimmersberger never discussed any of the receptionist positions cited in the above email with her.  This allegation is disputed by defendants.  As noted above, plaintiff's deposition testimony indicates that Wimmersberger did discuss certain receptionist positions with plaintiff but ultimately discovered and informed plaintiff that she was not qualified for them.

Plaintiff alleges that she spoke with supervisory personnel about creating a position that incorporated part but not all of the duties of her prior position and about returning to her prior position with an accommodation allowing her to be seated.  Plaintiff further asserts that she could have performed any number of tasks in the kitchen with her injuries, but in her deposition she

4

could not identify an open position that incorporated the tasks she described.  Rather, she agreed that there were people in the food and service department already doing those tasks and that there was not a specific person assigned to those tasks when she was a supervisor.  Plaintiff inquired about remaining in the greeter position on a permanent basis, but defendants informed her that the position was considered a temporary, six-month position available only to those on restricted duty.

Plaintiff did not interview for any open positions, and on January 10, 2003 she was terminated for failure to find a budgeted position in accordance with defendants' policy for employees assigned to modified duty.  On May 7, 2003, 118 days after plaintiff was terminated and 315 days after plaintiff's prior position had been filled, plaintiff dual-filed an employment discrimination complaint with the Pennsylvania Human Relations Commission and the Equal Employment Opportunity Commission.  The PHRC sent plaintiff a final disposition letter dismissing her claims on September 16, 2003.

On July 13, 2004, plaintiff submitted an application for social security disability insurance with the Social Security Administration.  In her SSDI application, plaintiff made certain representations regarding her physical condition: (1) "Because of my legs, knees, and back, I am unable to work to pay my bills;" (2) "I became unable to work because of my disabling condition on January 10, 2003;" (3) "I am still disabled;" (4) she has had to stop walking long distances; (5) she can walk only about three houses from her home before needing to stop due to pain in her knees and back; and (6) she cannot lift or carry a lot because of her back.  Plaintiff stated in her SSDI application that her prior supervisor position required walking and/or standing for eight hours per day; stooping; kneeling; crouching; handling, grabbing or

grasping big objects for four hours per day; and frequently lifting items weighing ten pounds.  On February 28, 2005, the Social Security Administration concluded that plaintiff became disabled on January 10, 2003 and that she was entitled to SSDI benefits.

On November 30, 2004, plaintiff filed a petition for reinstatement of workers' compensation benefits and for penalties with the Bureau of Workers' Compensation of the Commonwealth of Pennsylvania, Department of Labor and Industry.  A settlement was reached on February 15, 2006.

On August 1, 2005, plaintiff filed a petition for Chapter 13 bankruptcy in the United States Bankruptcy Court for the Eastern District of Pennsylvania.  In her petition, she represented that she did not have any prior suits or administrative proceedings within one year of the filing date and that she had no contingent and unliquidated claims.  The Bankruptcy Court entered an Order confirming a plan under Chapter 13 for plaintiff on February 10, 2006.

## STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides, in relevant part, that summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  An issue of material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  Summary judgment will be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

6

The party moving for summary judgment has the burden of demonstrating that there are no genuine issues of material fact. Id. at 322-23. "Where, as here, cross-motions for summary judgment have been presented, we must consider each party's motion individually. Each side bears the burden of establishing a lack of genuine issues of material fact." Reinert v. Giorgio Foods, Inc., 15 F. Supp. 2d 589, 593-94 (E.D. Pa. 1998). If the moving party sustains the burden, the nonmoving party must set forth facts demonstrating the existence of a genuine issue for trial. See Anderson, 477 U.S. at 255. Rule 56(e) provides that when a properly supported motion for summary judgment is made, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The adverse party therefore must raise "more than a mere scintilla of evidence in its favor" in order to overcome a summary judgment motion, and cannot survive by relying on unsupported assertions, conclusory allegations, or mere suspicions. Williams v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir. 1989). However, the "existence of disputed issues of material fact should be ascertained by resolving 'all inferences, doubts and issues of credibility against'" the moving party. Ely v. Hall's Motor Transit Co., 590 F.2d 62, 66 (3d Cir. 1978), quoting Smith v. Pittsburgh Gage & Supply Co., 464 F.2d 870, 878 (3d Cir. 1972).

DISCUSSION

In her complaint, plaintiff brings claims for disability discrimination pursuant to the ADA and the PHRA, retaliation pursuant to the ADA and the PHRA, and age discrimination pursuant to the ADEA and the PHRA. I will not address plaintiff's PHRA claims separately in this memorandum because plaintiff's PHRA claims are coextensive with her ADA and ADEA

claims.  "While Pennsylvania courts are not bound in their interpretations of Pennsylvania

Human Relations Act (PHRA) by federal interpretations of parallel provisions in Title VII, ADA,

or ADEA, Pennsylvania courts nevertheless generally interpret PHRA in accord with its federal

counterparts."  Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996) (concluding that the

district court properly treated plaintiff's PHRA claims as coextensive with his ADA and ADEA

claims).

　　　　As there is no direct evidence of discrimination based on disability or age in this case, I

will apply the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792

(1973), to plaintiff's claims.  See Kautz v. Met-Pro Corp., 412 F.3d 463, 465 (3d Cir. 2005)

(applying the burden-shifting framework of McDonnell Douglas to plaintiff's ADEA claim in the

absence of direct evidence of age discrimination); Shaner v. Synthes, 204 F.3d 494, 500-01 (3d

Cir. 2000) ("[T]he burden-shifting framework of [McDonnell Douglas] applies to ADA disparate

treatment and retaliation claims.").  The Court of Appeals has summarized the McDonnell

Douglas framework as follows:

> First, the plaintiff must establish a prima facie case of discrimination.  If the
> plaintiff succeeds in establishing a prima facie case, the burden shifts to the
> defendant "to articulate some legitimate, nondiscriminatory reason for the
> employee's rejection."  Finally, should the defendant carry this burden, the
> plaintiff then must have an opportunity to prove by a preponderance of the
> evidence that the legitimate reasons offered by the defendant were not its true
> reasons, but were pretext for discrimination.  While the burden of production may
> shift, "[t]he ultimate burden of persuading th trier of fact that the defendant
> intentionally discriminated against the plaintiff remains at all times with the
> plaintiff.

Jones v. Sch. Dist. of Philadelphia, 198 F.3d 403, 410 (3d Cir. 1999).

　　　　In their motion for summary judgment, defendants argue that plaintiff fails to establish a

prima facie case for both her ADA and ADEA claims and in the alternative that she fails to

demonstrate that defendants' reason for terminating her employment was pretextual. I will

discuss these arguments, but I first will discuss two additional, independent summary judgment

arguments brought by defendants: (1) plaintiff's failure to exhaust in a timely manner her

administrative remedies with respect to her ADA claim and (2) judicial estoppel.

I.      Failure to Exhaust Administrative Remedies in a Timely Manner

As the ADA adopts the powers, remedies and procedures of Title VII, 42 U.S.C. §

12117(a), an ADA plaintiff must file a charge with the EEOC either 180 or 300 days "after the

alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1). "In a State that has

an entity with the authority to grant or seek relief with respect to the alleged unlawful practice,"

such as the Pennsylvania Human Relations Commission, "an employee who initially files a

grievance with that agency must file the charge with the EEOC within 300 days of the

employment practice." Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 109 (2002); see

Watson v. Eastman Kodak Co., 235 F.3d 851, 854 (3d Cir. 2000) ("ADEA plaintiffs . . . who file

in deferral states[] must submit their administrative discrimination charge within 300 days of the

challenged employment action."). "[T]he last day of employment is not necessarily the date of

the adverse employment action." Watson, 235 F.3d at 856. "The proper focus is upon the time

of the discriminatory acts, not upon the time at which the consequences of the acts became most

painful." Del. State College v. Ricks, 449 U.S. 250, 258 (1980).

The key inquiry with respect to the timeliness issue is identifying the precise unlawful

employment practice alleged by plaintiff. Defendants argue that plaintiff's ADA claim is time-

barred as plaintiff was replaced as patient tray services supervisor on June 25, 2002, 315 days

prior to dual-filing her complaint with the PHRC and the EEOC on May 7, 2003. Plaintiff

counters that the alleged unlawful employment practices here are defendants' termination of

plaintiff on January 10, 2003 and defendants' "ongoing failure to engage in the interactive

process involving available accommodation for open positions at the hospital" while plaintiff

was on modified duty status.

Because plaintiff's complaint focuses on employment actions that occurred within 300

days of plaintiff's dual-filing of her complaint, untimeliness is not a basis for summary judgment

in this case.  I note, however, that plaintiff's complaint is limited in scope to plaintiff's

termination on January 10, 2003 and defendants' alleged failure to make reasonable efforts to

accommodate plaintiff with respect to open positions after her prior supervisor position had been

filled.  In her response brief, plaintiff concedes that any action based on either defendants'

alleged failure to accommodate plaintiff with respect to her prior supervisor position and

defendants' hiring of a replacement at that position is time-barred because plaintiff knew that

defendants closed her that position on June 25, 2002.

## II.      Judicial Estoppel

Defendant argues that plaintiff should be judicially estopped from pursuing her ADA

claim due to statements made in her application for social security disability insurance that are

irreconcilably inconsistent with a valid ADA claim.  Defendants also argue that judicial estoppel

applies to bar plaintiff's ADA and ADEA claims due to irreconcilably inconsistent statements

made in her petition for Chapter 13 bankruptcy.

Judicial estoppel is a judge-made doctrine that "seeks to prevent a litigant from asserting

a position inconsistent with one that she has previously asserted in the same or in a previous

proceeding." Ryan Operations G.P. v. Santiam-Midwest Lumber Co., 81 F.3d 355, 358 (3d Cir.

1995).  It is designed to prevent litigants from "playing fast and loose with the courts."  Id.,

quoting Scarano v. Central R.R. Co. of New Jersey, 203 F.2d 510, 513 (3d Cir. 1953).  "The

basic principle . . . is that absent any good explanation, a party should not be allowed to gain an

advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an

incompatible theory." 18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal

Practice and Procedure § 4477.  "Thus, the doctrine of judicial estoppel does not apply 'when the

prior position was taken because of a good faith mistake rather than as a part of a scheme to

mislead the court.'" Ryan Operations, 81 F.3d at 362.

In New Hampshire v. Maine, the Supreme Court identified three factors that "typically

inform" the application of the judicial estoppel doctrine:

> First, a party's later position must be clearly inconsistent with its earlier position.
> Second, courts regularly inquire whether the party has succeeded in persuading a
> court to accept that party's earlier position, so that judicial acceptance of an
> inconsistent position in a later proceeding would create the perception that either
> the first of the second court was misled . . . . A third consideration is whether the
> party seeking to assert an inconsistent position would derive an unfair advantage
> or impose an unfair detriment on the opposing party if not estopped.

532 U.S. 742, 750-51 (2001) (citations and internal quotation marks omitted).[2]  The Court further

noted, "In enumerating these factors, we do not establish inflexible prerequisites or an exhaustive

---

[2]The Court of Appeals has articulated the test as follows:

> Judicial estoppel may be imposed only if: (1) the party to be estopped is asserting
> a position that is irreconcilably inconsistent with one he or she asserted in a prior
> proceeding; (2) the party changed his or her position in bad faith, i.e., in a
> culpable manner threatening to the court's authority or integrity; and (3) the use of
> judicial estoppel is tailored to address the affront to the court's authority or
> integrity.

Montrose Med. Group Participating Sav. Plan v. Bulger, 243 F.3d 773, 777-78 (3d Cir. 2001).

11

formula for determining the applicability of judicial estoppel.  Additional considerations may

inform the doctrine's application in specific factual contexts."  Id. at 751.

A.      Judicial Estoppel and Plaintiff's SSDI Application

    Irreconcilable inconsistencies can arise in ADA litigation where the plaintiff has

previously applied for and received SSDI benefits.  The SSDI program provides benefits to a

person "under a disability" if "his physical or mental impairment or impairments are of such

severity that he is not only unable to do his previous work but cannot, considering his age,

education, and work experience, engage in any other kind of substantial gainful work which

exists in the national economy."  42 U.S.C. § 423(d)(2)(A).  The ADA prohibits discrimination

against a "qualified individual with a disability," i.e., "an individual with a disability who, with

or without reasonable accommodation, can perform the essential functions of the employment

position that such individual holds or desires."  42 U.S.C. § 12111(8).  The potential for

inconsistency arises where a plaintiff applies for SSDI benefits under a theory that she is totally

disabled and therefore unable to work yet subsequently sues her former employer under the ADA

and alleging that she could have worked but for some discriminatory act or policy.

    The Court of Appeals became one of the first courts to confront this issue in McNemar v.

Disney Store, Inc., 91 F.3d 610 (3d Cir. 1996).  The McNemar Court found that SSDI and ADA

claims were inconsistent in a way that could not be reconciled and therefore ruled that judicial

estoppel bars such claims.  However, McNemar quickly came under serious criticism from other

courts, the EEOC and academia.  See Krouse v. Am. Sterilizer Co., 126 F.3d 494, 502 n.3 (3d

Cir. 1997) (discussing authorities critical of McNemar).  Addressing the issue in Cleveland v.

Policy Management Corp., 526 U.S. 795, 802-03 (1999), the Supreme Court held that there is no

12

"inherent conflict" between the two statutes because a claim of disability under SSDI, unlike a

claim under the ADA, does not take into account the possibility of reasonable accommodation.

  In other words, if capable of performing a job with reasonable accommodation, an

individual can be both disabled for the purposes of SSDI and protected by the ADA.

Accordingly, the Court of Appeals has concluded that an individual's "statement of inability to

work [in an SSDI application] must be read as lacking the qualifier of reasonable

accommodation, which did not apply for purposes of her SSDI application, but does apply for

purposes of her ADA claim." Turner v. Hershey Chocolate USA, 440 F.3d 604, 609 (3d Cir.

2006) (holding that a response of "7/2001" to the SSDI application question regarding when

plaintiff became unable to work was not inconsistent with her ADA claim because her SSDI

application was saying, in effect, "I am unable to work without reasonable accommodation").

  Yet the Court of Appeals has acknowledged that even after Cleveland some ADA claims

will be precluded by prior SSDI claims:

> As the Supreme Court made clear in Cleveland . . . the mere fact that the statutory
> standards differ in some aspects does not mean that a prior assertion of permanent
> and total disability can never preclude a party from bringing a claim under the
> ADA . . . . There may be cases where, looking at the previous facts and statements
> by a party, the assertions are such that the party cannot prove that he was a
> qualified individual because his previous statements take the position that he
> could not perform the essential functions of the job, with or without
> accommodation.

Motley, 196 F.3d at 167.  In Cleveland, the Supreme Court emphasized that it was dealing with a

"representation of total disability" under SSDI, i.e., the general claim of disability that is

inherently made whenever an individual applies for SSDI benefits.  526 U.S. at 802.  At three

different points, the Court made clear that its decision did not change the law of judicial estoppel

as it applied to "directly conflicting statements about purely factual matters, such as, 'The light was red/green,' or 'I can/cannot raise my arm above my head.'" Id. at 802, 805 & 807.

In this case defendant argues that plaintiff cannot provide an explanation sufficient to reconcile the inconsistent statements between her SSDI application and her ADA claim and therefore cannot survive summary judgment.  Defendant cites six representations made by plaintiff about her physical condition in her SSDI application that are indicative of her inability to work with or without reasonable accommodation: (1) "Because of my legs, knees, and back, I am unable to work to pay my bills;" (2) "I became unable to work because of my disabling condition on January 10, 2003;" (3) "I am still disabled;" (4) plaintiff's assertion that she has had to stop walking long distances; (5) plaintiff's assertion that she can walk only about three houses from her home before needing to stop due to pain in her knees and back; and (6) plaintiff's assertion that she cannot lift or carry a lot because of her back.

I will not apply judicial estoppel to bar plaintiff's claims based on her SSDI application. Pursuant to the reasoning of the Court of Appeals in Turner, I read Statements One and Two above as lacking the qualifier of reasonable accommodation.  They therefore should be read as "I am unable to work *without reasonable accommodation* to pay my bills" and  "I became unable to work *without reasonable accommodation* because of my disabling condition."  Read as such, these statements are not irreconcilably inconsistent with plaintiff's present ADA claims. Statement Three above, plaintiff's assertion that she is still disabled, certainly is not irreconcilably inconsistent with her claim that defendants discriminated against her on the basis of her disability.

Defendants argue that Statements Four, Five and Six above – all factual assertions

14

regarding plaintiff's capacity to work – are inconsistent to the extent that they reflect an inability to perform the duties of her prior supervisor position.  Defendants also point to plaintiff's representations in her SSDI application regarding her prior supervisor position: specifically plaintiff's statements that her prior position required walking and/or standing for eight hours per day; stooping; kneeling; crouching; handling, grabbing or grasping big objects for four hours per day; and frequently lifting items weighing ten pounds.  However, as plaintiff is not contesting defendants' replacement of her at her prior supervisor position, her representations about that position are not irreconcilably inconsistent with her present assertion that she was able to fill a different position with reasonable accommodations.[3]  At most these statements indicate that plaintiff is limited in her ability to perform certain job functions – a point which is undisputed.

B.      Judicial Estoppel and Plaintiff's Bankruptcy Petition

The United States Bankruptcy Code imposes on debtors an affirmative duty of full disclosure.  Section 521 requires a debtor to file with the court "a schedule of assets and liabilities, a schedule of current income and current expenditures, and a statement of the debtor's financial affairs."  11 U.S.C. § 521(1).  "The schedule must disclose, *inter alia*, contingent and unliquidated claims of every nature and provide an estimated value for each one."  Ryan Operations, 81 F.3d at 362 (quotation marks omitted).  "These disclosure requirements are crucial to the effective functioning of the federal bankruptcy system.  Because creditors and the

---

[3]Defendants' argument that plaintiff should be judicially estopped from bringing her ADEA claim due to statements made in her SSDI application fails for the same reason. Defendants correctly note that to establish a prima facie case under the ADEA plaintiff must show she is "qualified" for her position prior to her termination.  However, plaintiff acknowledges that her claims are not based on her replacement at her prior position but her termination from employment despite the existence of open positions for which she was qualified.  Therefore I find that plaintiff's representations about her prior supervisor position and her physical abilities are not irreconcilably inconsistent with her present ADEA claim.

bankruptcy court rely heavily on the debtor's disclosure statement in determining whether to approve a proposed reorganization plan, the importance of full and honest disclosure cannot be overstated." Id., citing Oneida Motor Freight, Inc. v. United Jersey Bank, 848 F.2d 414, 417-18 (3d Cir. 1988).

As stated above, the key inquiry in considering the application of judicial estoppel remains whether plaintiff acted with the intent to play fast and loose with the courts. Id. at 358. Therefore, despite recognizing the importance of the disclosure provisions of the Bankruptcy Code, the Court of Appeals in Ryan Operations refused to adopt a rule that the requisite intent for judicial estoppel can be inferred from the mere fact of nondisclosure in a bankruptcy proceeding. Id. at 364. In Ryan Operations, plaintiff failed to list its pending claims as contingent assets in a prior bankruptcy proceeding; yet the Court determined that this failure was offset by a failure to list contingent liabilities and further noted that creditors would absorb a significant portion of any future recovery or loss from the nondisclosed claims. Id. at 363. The Court stated, "While we by no means denigrate the importance of full disclosure or condone nondisclosure in bankruptcy proceedings, we are unwilling to treat careless or inadvertent nondisclosures as equivalent to deliberate manipulation when administering the 'strong medicine' of judicial estoppel." Id. at 364. Because plaintiff "derived and intended no appreciable benefit from its nondisclosure" in Ryan Operations, judicial estoppel did not apply. Id. at 363.

In Ryan Operations the Court cited its prior decision in Oneida as an example of judicial estoppel based on nondisclosure in bankruptcy proceedings. Ryan Operations, 81 F.3d at 363, citing Oneida, 848 F.2d at 418. In Oneida, a debtor who listed the amount it owed to a creditor as a liability in bankruptcy petition without mention of a potential offset was judicially estopped

16

from pursuing a post-bankruptcy claim against that creditor because the debtor presented the creditors with a skewed sense of the debtor's financial condition.  848 F.2d at 418.  The Court found in Oneida that a "combination of knowledge of the claim and motive for concealment in the face of an affirmative duty to disclose gave rise to an inference of intent sufficient to satisfy the requirements of judicial estoppel."  Ryan Operations, 81 F.3d at 363, citing Oneida, 848 F.2d at 418.

In this case defendants argue that judicial estoppel applies to bar plaintiff's ADA and ADEA claims because she failed to disclose her EEOC claim in her petition for Chapter 13 bankruptcy.  Though her EEOC complaint still was pending, she represented under oath that she did not have any contingent and unliquidated claims and no prior suits or administrative proceedings within one year of filing her bankruptcy petition.  Further, defendants note that plaintiff possessed knowledge of this claim and motive for concealment: plaintiff's counsel sent a letter to the PHRC on May 3, 2005 – three months before plaintiff filed for bankruptcy – referencing her EEOC complaint number and stating that it was plaintiff's "intention to institute suit" in Pennsylvania state court, and defendants argue that motive for concealment can be implied from plaintiff's desire to benefit from a more favorable bankruptcy plan.

Despite plaintiff's failure to report her pending EEOC claim in her petition for bankruptcy, I will not apply judicial estoppel to bar plaintiff's present claims because she did not act with the intent to play fast and loose with the courts.  Though her claim before the EEOC still was pending when her bankruptcy petition was filed, plaintiff, an unsophisticated debtor, claims that she was unaware of the need to report her EEOC claim.  Plaintiff further claims that she was unaware of any right to pursue an ADA action after receiving a letter of dismissal from the

17

PHRC on September 16, 2003.  The May 3 letter indicating an intention to institute suit is

evidence of plaintiff's knowledge of the existence of an EEOC case number and her right to

institute suit, but it is not evidence sufficient to treat plaintiff's nondisclosure as equivalent to

deliberate manipulation.  Because the record does not indicate that plaintiff took further action

with respect to her potential suit – the EEOC had not issued plaintiff a right to sue letter, plaintiff

did not request a right to sue letter, and plaintiff had not instituted suit – prior to the filing her

bankruptcy petition, I find it credible that plaintiff's nondisclosure of her EEOC claim was

merely careless or inadvertent.  I refuse to imply motive for concealment merely from plaintiff's

desire to benefit from a more favorable bankruptcy plan; defendants essentially ask me to adopt a

rule that the requisite intent for judicial estoppel can be inferred from the mere fact of

nondisclosure in any bankruptcy proceeding, as a bad faith desire to benefit from a more

favorable bankruptcy plan can be imputed to any debtor.  I will not apply judicial estoppel to bar

plaintiff's present claims based on her bankruptcy petition.

III.    Disability Discrimination Pursuant to the ADA and the PHRA

        Counts I through IV of plaintiff's complaint allege violations of the ADA and the PHRA

on the basis of disability discrimination.  In their motion for summary judgment, defendants

argue that plaintiff has not established a prima facie case of disability discrimination or in the

alternative that plaintiff cannot show that the nondiscriminatory reason proffered by defendants is

pretextual.

A.    Prima Facie Case of Disability Discrimination

        The ADA prohibits discrimination "against a qualified individual with a disability

because of the disability of such individual in regard to job application procedures, the hiring,

advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  "In order to make out a prima facie case under the ADA, a plaintiff must be able to establish that he or she (1) has a 'disability' (2) is a 'qualified individual' and (3) has suffered an adverse employment action because of that disability."  Deane v. Pocono Med. Ctr., 142 F.3d 138, 142 (3d Cir.1998) (en banc).

I find that there are genuine issues of material fact with respect to each element of plaintiff's prima facie case under the ADA.  Therefore failure to establish a prima facie case is not the basis for summary judgment with respect to plaintiff's ADA claim.  Also, because I do not find plaintiff satisfies her prima facie case as a matter of law, I will deny plaintiff's motion for summary judgment on her ADA claim.

1.      Plaintiff as "Disabled" Under the ADA

The ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(2). "Merely having an impairment does not make one disabled for purposes of the ADA."  Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 195 (2002).  To establish that she has a disability, plaintiff must demonstrate that the impairment substantially limits a major life activity, "such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."  29 C.F.R. § 1630.2(i).  The EEOC guidelines define "substantially limits" as follows:

> (i) Unable to perform a major life activity that the average person in the general
> population can perform; or (ii) Significantly restricted as to the condition, manner,
> or duration under which an individual can perform a particular major life activity
> as compared to the condition, manner, or duration under which the average person

in the general population can perform the same major life activity.

29 C.F.R. § 1630.2(j)(1).  The following factors are considered in assessing whether an

individual is substantially limited in a major life activity: "(i) The nature and severity of the

impairment; (ii) The duration or expected duration of the impairment; and (iii) The permanent or

long term impact, or the expected permanent or long term impact of or resulting from the

impairment."  29 C.F.R. § 1630.2(j)(2).

"Under the EEOC's interpretive guidelines, determining whether an individual is

substantially limited in one or more of the major life activities requires a two-step analysis."

Mondzelewski v. Pathmark Stores, Inc., 162 F.3d 778, 783 (3d Cir. 1998).  First, the court

determines whether the individual is substantially limited in any major life activity other than

working.  Id.  In making this determination, the court compares the effect of the impairment on

that individual as compared with the "average person in the general population."  Id. ("[A]n

individual who had once been able to walk at an extraordinary speed would not be substantially

limited in the major life activity of walking if, as a result of a physical impairment, he or she

were only able to walk at an average speed, or even at a moderately below average speed.").  If

the court finds that the individual is substantially limited in a major life activities other than

working, the inquiry ends there.  Id.  However, if the individual is not so limited, the court then

must determine whether the individual is substantially limited in the major life activity of

working.  Id.

In this case plaintiff alleges that she is limited in the major life activities of walking and

working.  In Kelly v. Drexel University the Court of Appeals asserted that where plaintiff admits

that he is able to walk "the question presented is whether he adduced sufficient evidence from

which a factfinder reasonably could conclude that the nature and severity of his injury significantly restricted his ability to walk as compared with an average person in the general population." 94 F.3d at 105.  The Court of Appeals ruled that a plaintiff who walked slowly, could not walk for more than one mile and used a handrail while climbing stairs due to "severe post-traumatic degenerative joint disease of the right hip and protrusio acetabulum of the right hip joint" was only moderately restricted[4] and therefore not substantially limited in the major life activity of walking.  Id. at 106-08.  In contrast, the EEOC guidelines state that "an individual who, because of an impairment, can only walk for very brief periods of time would be substantially limited in the major life activity of walking."  29 C.F.R. app. § 1630.2(j).

In this case plaintiff testified at her deposition that due to her knee impairment she is not able to walk up the street without stopping to sit and rest for a few minutes, and in her SSDI application she stated that she could walk on level ground for only the distance of three houses before needing to stop.  In addition the record indicates that plaintiff uses a cane for support when walking; requires assistance from family members and neighbors for taking care of the

---

[4]In addition to Kelly, defendants cite to multiple cases in which courts have found impairment in walking that did not rise to the level of substantial limitation under the ADA.  See Lawler v. Quiktrip Corp., 172 Fed. Appx. 873 (10th Cir. 2006) (finding that plaintiff was not substantially limited where her deposition testimony revealed that she was able to perform activities involving standing and walking, feed herself, bathe herself, drive her automobile, take care of all her daily needs, and did not then or ever use a cane); Yudkovitz v. Bell Atl. Corp., 2004 WL 178330 (E.D. Pa. Jan. 12, 2004) (finding that plaintiff was not substantially limited because he walked slower, had difficulty climbing stairs, and used a quad-based cane as needed); Cade v. Consol. Rail Corp., 2002 WL 922150 (E.D. Pa. May 7, 2002) (finding that plaintiff was not substantially limited because of her moderate difficulty climbing stairs, her inability to sit for a long period of time, her inability to stand for a long period of time without sitting or shifting her weight, and her use of a cane when feeling unusual pain); Penchishen v. Stroh Brewery Co., 932 F. Supp. 671 (E.D. Pa. 1996) (finding that plaintiff was not substantially limited because of her need to use stairs by placing both feet on each step before moving to the next step); see also Penny v. United Parcel Serv., 128 F.3d 408 (6th Cir. 1997) ("Moderate difficulty or pain experienced while walking does not rise to the level of a disability.").

house, food shopping and preparing meals; and experiences difficulty with personal care. Plaintiff's testimony suggests that plaintiff is more limited in her ability to walk than the plaintiffs in <u>Kelly</u> and other cases cited by defendants.  Indeed, plaintiff's ability to walk falls squarely within the EEOC guidelines' example for an individual substantially limited in the major life activity of walking.

I conclude that there exists a genuine issue of the material fact as to whether plaintiff was substantially limited in the major life activity of walking so as to qualify as disabled under the ADA.  However, I do not find that plaintiff has established she is disabled under the ADA as a matter of law based on her ability to walk.  As defendants point out, plaintiff also testified that she can stand for thirty minutes to an hour before standing becomes too uncomfortable and that plaintiff presented no evidence that her use of a cane while employed was medically prescribed. Further, whether plaintiff was so limited in her ability to walk while she was employed with defendants is unclear from the record.

In support of her motion for summary judgment with respect to her ADA claim, plaintiff alternatively argues that she meets element one of her prima facie case because she is substantially limited in the major life activity of working.  An individual is substantially limited in the major life activity of working when she is "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities."  <u>Olson v. Gen. Elec. Astrospace</u>, 101 F.3d 947, 952 (3d Cir. 1996), <u>citing</u> 29 C.F.R. § 1630.2(j)(3)(i).  In assessing plaintiff's ability to work, a court must "consider the individual's training, skills, and abilities in order to evaluate 'whether the particular impairment constitutes for the particular person a significant barrier to

employment.'"  Mondzelewski v. Pathmark Stores, Inc., 162 F.3d 778, 784 (3d Cir. 1998), citing

Webb v. Garelick Mfg. Co., 94 F.3d 484, 488 (8th Cir. 1996).  "The inability to perform a single,

particular job does not constitute a substantial limitation in the major life activity of working."

29 C.F.R. § 1630.2(j)(3)(i).  "On the other hand, an individual does not have to be totally unable

to work in order to be considered substantially limited in the major life activity of working."  29

C.F.R. app. § 1630.2(j).  "For example, an individual who has a back condition that prevents the

individual from performing any heavy labor job would be substantially limited in the major life

activity of working because the individual's impairment eliminates his or her ability to perform a

class of jobs.  This would be so even if the individual were able to perform jobs in another class,

e.g., the class of semi-skilled jobs."  Id.

The question of whether plaintiff's impairment substantially limits her in the major life

activity of working cannot be resolved at the summary judgment stage.  Defendants argue that

because plaintiff was not precluded from food service work, a class of jobs that was widely

available, and further had no work restrictions based on physical impairment at the time of the

alleged adverse employment actions, she is not substantially limited in the major life activity of

working.  Yet pursuant to the EEOC guidelines even if plaintiff was able to perform jobs in the

class of food service work she still may be substantially limited if her impairment prevents her

from performing either a class of jobs or a broad range of jobs in various classes as compared to

the average person having comparable training, skills and abilities.  Her designated job status is

not dispositive here as it does not prove the actual nature of plaintiff's abilities due to her alleged

impairments.  Plaintiff's vocational expert concluded that plaintiff cannot perform heavy and

medium level work, as well as a broad range of jobs in the light and sedentary classes which

require lifting, climbing, squatting, walking and standing beyond her capabilities, all of which she would be eligible for due to her training, skills and abilities.  Defendants note that plaintiff's vocational expert examined her well after her employment had been terminated, and her condition at the time of her examination is not relevant.  However, the expert report is sufficient to present a genuine issue of material fact as to whether plaintiff is substantially limited in the major life activity of working.

In support of her motion for summary judgment with respect to her ADA claim, plaintiff alternatively argues that she meets element one of her prima facie case because defendants regarded her as disabled.[5]  A plaintiff "may be considered disabled even if his impairment does not substantially limit a major life activity, if his impairment 'is treated by a covered entity as constituting such limitation.'"  Kelly, 94 F.3d at 108, quoting 29 C.F.R. § 1630.2(*l*)(1).  "[T]he mere fact that an employer is aware of an employee's impairment is insufficient to demonstrate either that the employer regarded the employee as disabled or that perception caused the adverse

_____

[5]The EEOC regulations provide that an individual is "regarded as" disabled if she:

(1) Has a physical or mental impairment that does not substantially limit major life activities but is treated by a covered entity as constituting such limitation;
(2) Has a physical or mental impairment that substantially limits major life activities only as a result of the attitude of others towards such impairment; or
(3) Has none of the impairments defined in paragraph (h)(1) or (2) of this section but is treated by a covered entity as having a substantially limiting impairment.

29 C.F.R. § 1630.2(*l*).  Under 29 C.F.R. § 1630.2(h), a "physical or mental impairment" is:

(1) Any physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine; or
(2) Any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

employment action." Id. at 109.

I find a genuine issue of material fact as to whether defendants regarded plaintiff as disabled when attempting to find her a permanent position and terminating her employment. Plaintiff cites the work restrictions placed on plaintiff during the months following her injury to establish that defendants regarded her as disabled.  Though individual employees of defendants were aware of plaintiff's use of a cane and difficulty with her knees, such evidence of awareness alone is insufficient to demonstrate that defendants regarded plaintiff's impairments as disabling. The work restrictions cited by plaintiff merely demonstrate that defendants recognized plaintiff sustained a leg injury on March 3, 2002 and remained physically impaired over the following months.  Defendants released plaintiff to return to regular duty without restrictions on June 25, 2002 while she was working as a greeter.  This release indicates that defendants did not regard plaintiff as disabled but rather regarded her as eligible to work without restriction based on any physical impairment when the alleged adverse employment actions took place.

However, defendants release of plaintiff to regular duty does not establish conclusively that defendants did not regard plaintiff as disabled.  Though defendants contend they were completely unaware of plaintiff's physical impairments, plaintiff testified at her deposition that Frank Wimmersberger discounted jobs for which plaintiff was otherwise qualified because of the walking requirements of those positions:

> Q.    Down below, there are various jobs for food service worker.  Do you see those?
> A.    Yes.
> Q.    Is that another job that you would have asked Frank to inquire about?
> A.    Well, the food service one here that Frank told me was for hostess position and the hostess position was considered walking because you had to take trays upstairs to the patients and you had to walk around a lot.  And he said that I couldn't do that, I wouldn't be able to do that.

25

According to his deposition, Wimmersberger did not meet with plaintiff until October 2002, months after she had been released to full duty status.  Contrary to defendants' present contentions plaintiff's testimony indicates that defendants at least were aware that plaintiff had some physical impairment regardless of her full duty status and that awareness effected their employment decisions.  Therefore I find a genuine issue of material fact exists with respect to whether defendants regarded plaintiff as disabled.

2.      Plaintiff as "Qualified Individual" Under the ADA

Defendants alternatively argue that plaintiff cannot establish a prima facie case even if she is "disabled" because she presents no evidence that she is a "qualified individual" under the ADA.  The ADA defines "qualified individual" as an individual "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).  The EEOC guidelines creates a two-part test for making this determination: (1) a court must determine whether the individual satisfies the requisite skill, experience, education and other job-related requirements of the employment position that such individual holds or desires; and (2) a court must determine whether the individual, with or without reasonable accommodation,[6] can perform the essential

---

[6]According to the EEOC guidelines:

(1) The term reasonable accommodation means:

(i) Modifications or adjustments to a job application process that enable a qualified applicant with a disability to be considered for the position such qualified applicant desires; or

(ii) Modifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position; or

functions of the position held or sought.  29 C.F.R. app. § 1630.2(m), cited in Deane v. Pocono

Med. Ctr., 142 F.3d 138, 145 (3d Cir. 1998).

Though plaintiff testified that she was not qualified for most of defendants' open

positions and provided examples of specific positions for which she was not qualified, this

testimony does not prove that plaintiff is unable to meet her burden of showing that she could

perform the essential functions of any open position.  Indeed, as defendants note in their briefs it

is undisputed that open food service positions existed at the time of the alleged adverse

employment actions.  Therefore plaintiff's deposition testimony does not contradict plaintiff's

present allegation that there existed over thirty-five positions for which she was qualified and

which she could have performed.

------

(iii) Modifications or adjustments that enable a covered entity's employee with a disability to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities.

(2) Reasonable accommodation may include but is not limited to:

(i) Making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and

(ii) Job restructuring; part-time or modified work schedules; reassignment to a vacant position; acquisition or modifications of equipment or devices; appropriate adjustment or modifications of examinations, training materials, or policies; the provision of qualified readers or interpreters; and other similar accommodations for individuals with disabilities.

(3) To determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the qualified individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.

29 C.F.R. § 1630.2(o).

Defendants next contend that plaintiff is not a "qualified individual" because she failed to interview for any open positions, i.e., she never held nor desired an open position. Yet at her deposition plaintiff stated that when she expressed an interest in a position generically called "food service worker," Frank Wimmersberger told her that she could not perform that position due to the amount of walking involved. Because Wimmersberger may have prohibited or discouraged plaintiff from applying for any and all open food service worker positions on this basis, including those which defendant now concede were available and suited to plaintiff's qualifications, I conclude that plaintiff's failure to interview and apply for any open positions is not a proper basis for summary judgment. The record also indicates that defendants possibly identified positions for which plaintiff was qualified but did not offer them because "the grade and salary will almost absurdly be below hers." Wimmersberger also testified that "[t]he positions that [plaintiff] had interest in were usually lower paying that what she had been making before she got hurt" and that salary, in addition to finding jobs suitable for plaintiff's skill set, was a problem in finding open positions for plaintiff. Whatever their reasons defendants never offered any open positions to plaintiff. I conclude that this fact, when accompanied by the testimony of Wimmersberger and the statements made by defendants in their briefs, raises a genuine issue of material fact as to whether plaintiff was a "qualified individual" under the ADA.

3.      Adverse Employment Action Because of Disability

Plaintiff alleges two adverse employment actions in this case: failure to accommodate and wrongful termination on the basis of disability. "Discrimination under the ADA encompasses not only adverse actions motivated by prejudice and fear of disabilities, but also includes failing to make reasonable accommodations for a plaintiff's disabilities." Taylor v. Phoenixville Sch.

<u>Dist.</u>, 184 F.3d 296, 306 (3d Cir. 1999).  An employer commits unlawful discrimination under the ADA if it does "not mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [it] can demonstrate that the accommodation would impose an undue hardship on the operation of [its] business . . . ."  42 U.S.C. § 12112(b)(5)(A).  "[I]f an employer has adequate notice of an employee's disability, and the employee requests accommodations for the disability, it becomes the responsibility of the employer to 'engage the employee in the interactive process of finding accommodation.'  If an 'employee could have been reasonably accommodated but for the employer's lack of good faith,' the employee would win on his failure to accommodate claim."  <u>Armstrong v. Burdette Tomlin Mem'l Hosp.</u>, 438 F.3d 240, 246 (3d Cir. 2006) (citation omitted) (interpreting the requirements for failure to accommodate under the New Jersey Law Against Discrimination in accordance with the ADA), <u>quoting</u> <u>Taylor</u>, 184 F.3d at 319-20.  "[T]he process must be interactive because each party holds information the other does not have or cannot easily obtain."  <u>Taylor</u>, 184 F.3d at 316.  "Participation [in the interactive process] is the obligation of both parties . . . so an employer cannot be faulted if after conferring with the employee to find possible accommodations, the employee then fails to supply information that the employer needs or does not answer the employer's request for more detailed proposals."  <u>Id.</u> at 317.  In order to show defendants failed to participate in the interactive process, plaintiff must establish four elements: (1) she was disabled and the employer knew it; (2) she requested an accommodation or assistance; (3) the employer did not make a good faith effort to assist; and (4) she could have been reasonably accommodated.  <u>See</u> <u>id.</u> at 319-20.

As addressed above, genuine issues of fact exist regarding whether plaintiff was

"disabled" under the ADA and whether defendants knew of plaintiff's disability.  I further find genuine issues of fact as to whether plaintiff requested an accommodation or assistance, whether defendants engaged plaintiff in the interactive process in good faith, and whether plaintiff could have been accommodated.  Plaintiff's account of her conversations with Frank Wimmersberger indicates that Wimmersberger knew of both plaintiff's impairment, which may constitute a disability under the ADA, and plaintiff's desire to be accommodated in October 2002, after she had been released to full duty.  As noted above, plaintiff alleges that Wimmersberger prohibited her from applying for the job to "food service worker" based on her physical impairments.  Yet defendants now assert both that it is undisputed that there existed other food service worker positions for which plaintiff was qualified and that they did not know plaintiff was impaired.

Based on defendants' present assertions, and crediting plaintiff's account of her interactions with defendants and specifically Frank Wimmersberger, I determine that a reasonable jury could conclude that defendants did not make a good faith effort to engage plaintiff in the interactive process.  I will not grant summary judgment for defendants on the grounds that they were not aware of plaintiff's impairments or that they did not know plaintiff wanted to be accommodated.  Finally, defendants' concession that other food service worker positions for plaintiff existed indicates that plaintiff could have been reasonably accommodated had the interactive process proceeded properly.

Genuine issues of material fact permeate plaintiff's failure to accommodate claim, and because the alleged failure to accommodate culminated in plaintiff's termination at the expiration of her modified work duty placement these genuine issues of material fact relate to plaintiff's wrongful termination claim, as well.  Therefore I will not grant defendants' motion for summary

judgment on plaintiff's ADA claim on the basis that plaintiff cannot establish her prima facie case.

B.      Failure to Demonstrate that Her Termination Was Pretextual

        Defendants argue that even if plaintiff can establish a prima facie case summary judgment should be granted because defendants articulate a legitimate, nondiscriminatory reason for plaintiff's termination and plaintiff cannot show that reason was pretextual.  Where defendants articulate a legitimate reason for the adverse employment action, "a plaintiff may defeat a motion for summary judgment . . . by pointing 'to some evidence, direct or circumstantial, from which a factfinder would reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.'"  Shaner v. Synthes (USA), 204 F.3d 494, 501 (3d Cir. 2000), quoting Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994). "[T]he non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for the asserted non-discriminatory reasons." Fuentes, 32 F.3d at 765.  In a retaliation case, "[t]he plaintiff must prove that retaliatory animus played a role in the employer's decisionmaking process and that it had a determinative effect on the outcome of that process." Krouse v. Am. Sterilizer Co., 126 F.3d 494, 501 (3d Cir. 1997).  "[T]he factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent or competent." Fuentes, 32 F.3d at 764-65.

        Defendants' proffered reason for plaintiff's termination was her inability to find a

31

budgeted position within six months of being released to full duty. Defendants terminated

plaintiff's employment in accordance with its modified duty employment policy. Yet when

considering a failure to accommodate claim, the Court of Appeals has held that "where there is a

genuine dispute about whether the employer acted in good faith, summary judgment will

typically be precluded." Taylor, 184 F.3d at 318. "When an employee has evidence that the

employer did not act in good faith in the interactive process . . . we will not readily decide on

summary judgment that accommodation was not possible and the employer's bad faith could

have no effect." Id. As whether defendants acted in good faith in engaging plaintiff in the

interactive process remains an open question at this stage of the litigation, the question of

whether defendants' proffered reason for plaintiff's termination is legitimate also remains open.

Though it is undisputed that defendants acted in accordance with the timeline of their modified

duty policy, what defendants knew about plaintiff's impairments and what defendants did to

accommodate plaintiff during her six month grace period are uncertain from the record. If a

reasonable factfinder determines that defendants did not act in good faith, that factfinder could

reasonably disbelieve the defendants' articulated legitimate reasons for their failure to

accommodate and eventually terminate plaintiff. Therefore I will not grant summary judgment

for defendants on plaintiff's ADA claim.

IV.     Age Discrimination Pursuant to the ADEA and the PHRA

Counts V and VI of plaintiff's complaint allege violations of the ADEA and the PHRA

on the basis of age discrimination. In their motion for summary judgment, defendants argue

plaintiff has not established a prima facie case of age discrimination or in the alternative that

plaintiff cannot show that the nondiscriminatory reason proffered by defendants is pretextual.

Under the ADEA it is "unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). "When . . . a plaintiff alleges that he has suffered age discrimination predicated on disparate treatment, liability under the ADEA depends on whether age 'actually motivated the employer's decision.'" Monaco v. Am. Gen. Assurance Co., 359 F.3d 296, 300 (3d Cir. 2004), quoting Hazen Paper Co. v. Biggins, 507 U.S. 604, 610 (1993).

To state a prima facie case of age discrimination under the ADEA, plaintiff must establish that she: (1) was a member of a protected class (i.e., he or she was forty years of age or older); (2) was qualified for the position at issue; (3) suffered an adverse employment action; and (4) was replaced by a sufficiently younger person, raising an inference of age discrimination. Showalter v. Univ. of Pittsburgh Med. Ctr., 190 F.3d 231, 234 (3d Cir. 1999). The Court of Appeals has held that a plaintiff does not necessarily need to demonstrate that she was replaced by someone outside the protected class to meet her burden: "a plaintiff could meet her prima facie burden by demonstrating generally that 'she was either not hired for [a] position or was fired from it under circumstances that give rise to an inference of unlawful discrimination.'" Pivirotto v. Innovative Sys., Inc., 191 F.3d 344, 357 (3d Cir. 1999) (citing cases), quoting Waldron v. SL Indus., Inc., 56 F.3d 491, 494 (3d Cir. 1995).

I find that plaintiff cannot establish a prima facie case of age discrimination because she offers no evidence that gives rise to an inference of unlawful discrimination based on her age. Though plaintiff was replaced by a younger person at her former supervisor position, plaintiff concedes in her brief that employment action occurred 315 days prior to her dual-filing of her

complaint with the EEOC and the PHRC and any present claim based on that action is time-barred.  At her deposition plaintiff stated that she has no support for her age discrimination claim other than her feeling that defendants replaced her with a younger person and could have found a position for her:

> Q.   Mrs. Quick, also one of the claims that you're making against Einstein is that you believe that you were discriminated against based on your age. Do you understand that?
> A.   Yes.
> Q.   And do you have any support for that claim?
> A.   No.  No more than the way I feel.  And I feel they gave my position to a younger person because they figured maybe I was too old for it or whatever because it discriminates by them not trying to find me nothing else to do.  That's why I figured I was discriminated against, because I think, like I said before, I think they could have found something for me to do because I know there's a lot in there that I could have done.

I find this testimony to be insufficient to raise an inference of unlawful discrimination based on age.  Plaintiff offers no evidence regarding younger individuals other than her replacement at her former supervisor position and therefore has no support for her allegation that younger individuals were offered the open positions which plaintiff allegedly desired and for which plaintiff was qualified.  Because I conclude that plaintiff cannot satisfy her prima facie case of age discrimination I will grant defendants' motion for summary judgment on Counts V and VI of her complaint.

An appropriate Order follows.

34

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JEAN A. QUICK | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| ALBERT EINSTEIN HEALTHCARE, et al. | : | NO. 05-4940 |

**<u>ORDER</u>**

AND NOW, this 23rd day of October 2007, upon consideration of the parties' cross-motions for summary judgment, responses and replies, and for the reasons set forth in the accompanying memorandum, it is hereby ORDERED that defendants' motion for summary judgment is GRANTED with respect to Counts V and VI of plaintiff's complaint.  Judgment is entered in favor of defendants and against plaintiff with respect to Counts V and VI of plaintiff's complaint.  In all other respects, defendants' motion for summary judgment is DENIED.  It is further ORDERED that plaintiff's motion for summary judgment is DENIED.


s/Thomas N. O'Neill, Jr.
THOMAS N. O'NEILL, JR., J.